IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| CHRIS CLAUSEN, | ) | 4:07CV3136 |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

The plaintiff, Chris Clausen, protectively filed an application for disability insurance benefits under Title II of the Social Security Act on May 20, 2004, alleging that he became disabled on July 17, 2001, because of a work-related back injury. After the application was denied (initially on July 26, 2004, and on reconsideration on August 26, 2004), Clausen requested an administrative hearing.

A hearing was held on July 19, 2005, following which was submitted a report letter from Clausen's treating physician, Stephen E. Doran, M.D., who stated that Clausen was restricted to working not more than 4 hours per day, that he must be able to change positions as needed, and that he cannot do bending, stooping, prolonged standing, or lifting over 10 pounds. Dr. Doran stated that these restrictions had been in place since February 23, 2005.

The administrative law judge convened a supplemental hearing on June 1, 2006, and called upon a medical expert, George Weilepp, M.D., who testified that Clausen's impairments equaled Listing 1.04 from July 2001 until June 2003, but that after a spinal fusion at L5-S1 (and 2 earlier discectomies at the same location) Clausen was medically improved. Dr. Weilepp opined that Clausen could frequently lift 10 pounds and occasionally lift 20 pounds, could sit 6 hours with a sit/stand

option at 90 minutes, could stand or walk 6 hours a day for 90 minutes at a time, would be precluded from working at heights or on ladders, should avoid heavy industrial vibration and dangerous industrial equipment with the lower extremities, could not perform industrial driving, could climb a flight of stairs 2 to 3 times a day, and could not perform frequent kneeling, crawling, squatting, or overhead activities.

In a decision issued on September 15, 2006, the ALJ relied upon Dr. Weilepp's testimony, and also the testimony of a vocational expert, to find that Clausen was disabled for a closed period from July 1, 2001, until June 13, 2003, but that his disability ended on June 14, 2003. The Appeals Council denied Clausen's request for review on April 19, 2007, and this action followed.

Simply stated, the issues before the court are whether the ALJ erred by accepting the medical expert's opinion over that of the treating physician and by discrediting Clausen's complaints of pain. After careful review of the administrative record, I find that the ALJ's decision (which constitutes the Commissioner's final decision) should be affirmed pursuant to sentence four of 42 U.S.C. § 405(g).

### *Statement of Facts*

As identified by the parties in their respective briefs, the material facts of the case (listed in chronological order) are as follows:[1]

1. Clausen saw William Becker, M.D., on June 18, 2001, and requested a pain pill and muscle relaxant (Tr. 246).

2. Clausen had normal lumbosacral spine x-rays on July 17, 2001 (Tr. 247).

---

[1] I have combined the parties' separate statements of fact and edited their content slightly for clarity, to avoid redundancy, and to eliminate certain statements that are not directly supported by the record as cited by the parties.

3. Curtis Meyer, D.C., provided chiropractic care to Clausen throughout July 2001 (Tr. 248-51).

4. Clausen saw James Froggatt, M.D., on August 2, 2001, for low back pain that radiated to his left leg (Tr. 267).

5. On August 6, 2001, Dr. Froggatt noted that Clausen's MRI showed a large extruded disc at L5-S1 (Tr. 265).

6. Clausen elected to go forward with surgery to repair the disc (Tr. 265).

7. Dr. Froggatt performed the surgery on August 14, 2001 (Tr. 252-56).

8. Clausen had resolution of most of his pain following surgery, and Dr. Froggatt discharged him on August 16, 2001, with a good prognosis (Tr. 252).

9. Clausen saw Dr. Froggatt for follow-up of his surgery on August 23, 2001, and reported that he was able to walk a total of about a mile a day (Tr. 264).

10. On September 13, 2001, Clausen saw Dr. Froggatt and reported no significant improvement (Tr. 262).

11. Clausen attended physical therapy on October 16, 2001, and continued to complain of numbness in his foot (Tr. 276).

12. Clausen continued therapy through November 1, 2001, when he reported moderate complaints of pain (Tr. 275-76).

13. On November 5, 2001, Doug Junge, P.T., reported that Clausen had excellent progress with lumbar flexibility, but continued to complain of pain and numbness (Tr. 277).

14. Clausen saw Dr. Froggatt on November 5, 2001, and reported that he had been in severe pain for about a week since doing lunges at physical therapy (Tr. 258).

15. Dr. Froggatt noted that Clausen should discontinue physical therapy and could not return to work (Tr. 260).

16. On November 15, 2001, Dr. Froggatt noted that Clausen was not getting any better and may be getting worse (Tr. 257).

17. Clausen reported increased left leg pain with coughing, sneezing, and flexing the neck (Tr. 257).

18. Leslie Hellbusch, M.D., examined Clausen on October 1, 2001 (Tr. 331-32).

19. Dr. Hellbusch diagnosed status post left L5-S1 microscopic lumbar discectomy and persistent left leg radiculopathy (Tr. 332).

20. On November 19, 2001, Dr. Hellbusch reported that Clausen walked normally and had decreased sensation in his left foot (Tr. 329).

21. Dr. Hellbusch performed a redo microlumbar discectomy L5-S1 on December 11, 2001 (Tr. 269-73).

22. On January 9, 2002, Clausen reported feeling stiff with lower back pain and no leg pain (Tr. 327).

23. Clausen reported that he was getting better slowly when he saw Dr. Hellbusch on February 25, 2002 (Tr. 326).

24. Clausen reported that he was walking about one mile per day (Tr. 326).

25. Dr. Hellbusch recommended Clausen could perform light duty work with no lifting over 20 pounds and no repetitive bending or twisting (Tr. 326).

26. On April 15, 2002, Clausen reported constant back pain which was worse with increased activity (Tr. 325).

27. When evaluated in follow up on May 20, 2002, by Dr. Hellbusch, Clausen was complaining of increased pain and numbness; on examination, flexion of the back 80 degrees produced some back and left posterior thigh pain, and he had left posterior thigh pain with straight leg raising to 70 degrees, a markedly decreased left ankle jerk, and decreased pin prick sensation in his whole left foot; due to Clausen's increased pain, a lumbar MRI was performed which showed L5-S1 mild diffuse disc bulging and L5-S1 left fibrosis (Tr. 319).

28. Dr. Hellbusch reported that Clausen could not lift more than 10 pounds, could not do repetitive back bending or twisting, and required a job in which he could sit and stand at will (Tr. 319).

29. Clausen saw Dr. Hellbusch on July 8, 2002, and reported hamstring pain and back pain which was increased with activity such as playing catch with his son or extended walking (Tr. 318).

30. Clausen reported that he was walking about one mile per day (Tr. 318).

31. Dr. Hellbusch recommended Clausen continue light duty work and gradually increase his exercise (Tr. 318).

32. Clausen saw Stephen Doran, M.D., on August 1, 2002, for evaluation of his back pain; he complained of severe low back pain which had been refractory to interventions including physical therapy and multiple medications. (Tr. 317).

33. Dr. Doran recommended that Clausen undergo a fusion at L5-S1 (Tr. 317).

34. Dr. Doran performed a lateral interbody fusion at L5-S1 on August 23, 2002 (Tr. 280-86).

35. Clausen saw Dr. Doran for postopeartive follow-up on September 18, 2002, and was doing well (Tr. 315).

36. Clausen felt his back pain was improved and his left leg numbness was unchanged (Tr. 315).

37. X-rays showed the grafts were positioned well (Tr. 315).

38. Clausen returned to see Dr. Doran on October 30, 2002, and reported continued significant low back pain (Tr. 312).

39. X-rays showed no change in his instrumentation and that his interbody grafts appeared to be consolidating (Tr. 312).

40. On November 27, 2002, Clausen reported that his back pain had not improved (Tr. 310).

41. X-rays performed that day showed anatomic alignment status post fusion at L5-S1 (Tr. 309).

42. Dr. Doran opined that Clausen could work at a sedentary position that did not require lifting more than 10 pounds, bending, stooping, or prolonged standing (Tr. 310).

43. A CT scan performed on February 26, 2003, showed L5-S1 spinal fusion with graft not fully incorporated (Tr. 308).

44. Clausen saw Dr. Doran that same day and reported that he continued to have significant back pain (Tr. 307).

45. Dr. Doran fit Clausen for a bone stimulator. (Tr. 307).

46. Dr. Doran gave Clausen permission to return to work with no lifting over 10 pounds and no bending, stooping, or prolonged standing (Tr. 307).

47. Dr. Doran noted that Clausen could work no more than four hours a day (Tr. 307).

48. On April 16, 2003, Dr. Doran noted that Clausen had been working four hours per day on light duty, and he recommended Clausen continue with that (Tr. 306).

49. Clausen saw Dr. Doran on June 11, 2003, and reported no improvement in his symptoms (Tr. 305).

50. Clausen reported that he was working four hours a day on light duty (Tr. 305).

51. According to Dr. Doran, a CT of the lumbar spine performed on June 11, 2003, showed that Clausen "is fused well" (Tr. 305).

52. Bruce Baron, D.O., reported that the CT scan showed anatomic alignment with numerous small areas of intact bridging bone about the disc space, but also

numerous areas that were not completely incorporated; the left L5-S1 facet joint did not appear to be convincingly fused (Tr. 304).

53. Jay Spracklen, P.T., performed a functional capacity evaluation of Clausen on June 26, 2003 (Tr. 287-99).

54. The physical therapist's evaluation showed that Clausen could perform occasional lifting, standing, walking, sitting, carrying, pushing, climbing, and handling; that he should never stoop or crawl; that he Clausen could frequently pull, balance, kneel, crouch, and reach; that he could constantly finger, feel, talk, hear, and see; and that he was able to perform consistently at the light physical demand level (Tr. 287).

55. Clausen saw Dr. Doran on August 13, 2003, and reported that he had not benefitted from surgery (Tr. 303).

56. Dr. Doran noted that he thought the restrictions listed on the functional capacity evaluation were reasonable (Tr. 303).

57. On August 26, 2003, Dr. Doran recommended that Clausen be evaluated at a pain management center (Tr. 302).

58. As of September 4, 2003, Clausen was having a difficult time coping with less than 3 Lortab per day (Tr. 301).

59. On February 11, 2004, Clausen saw Chris Criscuolo, M.D., on referral by Dr. Doran for treatment options regarding low back pain and left leg pain (Tr. 340).

60. Dr. Criscuolo noted that Clausen had a normal gait with full strength in his lower extremities; he had some lumbar paravertebral spasm, but otherwise the examination was unremarkable (Tr. 340).

61. Dr. Criscuolo diagnosed failed back surgery syndrome and lumbar radiculopathy (Tr. 340).

62. Dr. Criscuolo started Clausen on Bextra 20 mg once a day and Zonegran 110 to 200 mg at bedtime (Tr. 340).

7

63. Clausen returned to Dr. Criscuolo on May 5, 2004, for an epidural steroid injection (Tr. 336).

64. On June 9, 2004, Clausen reported that he received only two days of relief from the epidural injection (Tr. 335).

65. Because Clausen did not respond to the caudal, Dr. Criscuolo changed his medication and recommended that he enroll in a behavioral pain program (Tr. 335).

66. Clausen followed up with Dr. Criscuolo on July 19, 2004, and reported that he was not sleeping well (Tr. 334).

67. Rex Schmidt, Psy.D., performed a psychological pain assessment of Clausen on July 20, 2004 (Tr. 342-45).

68. Dr. Schmidt diagnosed pain disorder associated with both psychological and medical factors, major depressive disorder secondary to chronic pain, and failed back surgery syndrome (Tr. 344).

69. Dr. Schmidt assessed Clausen's Global Assessment of Functioning (GAF)[2] at 58[3] (Tr. 344).

70. Dr. Schmidt recommended a rehabilitation pain management program (Tr. 345).

71. Clausen underwent a pain management program screening evaluation on July 20, 2004 (Tr. 347-50).

---

[2]Global assessment of functioning is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. *See* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed., text revision 2000) (DSM-IV-TR).

[3]A GAF of 51 through 60 is characterized by moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *See* DSM-IV-TR at 34.

8

72. During the evaluation, Clausen reported that his activities included playing catch with his children and trying to be active consistent with his physician's instructions (Tr. 349); he was noted to be physically appropriate to participate in the pain management program (Tr. 347).

73. Clausen participated in the pain management program from August 9, 2004, through September 3, 2004 (Tr. 355-427).

74. When Clausen completed the pain management program, he was sitting one hour two times per day, walking 24 minutes one time per day, climbing four flights of stairs, and was planning to go back to work (Tr. 357).

75. On September 3, 2004, Adrienne Conner, P.T., opined that Clausen was able to return to a moderately physical job within the limits of his surgeon's recommendations and functional capacity testing; he further stated that Clausen would need to continue to use pacing strategies (Tr. 357).

76. Clausen continued to see his primary provider at the Ivy Street Medical Clinic with complaints of low back pain and depression; on December 20, 2004, he received 40 mg Depo Medrol injection and was continued on Benacar, Lexapro, HCTZ. (Tr. 435).

77. On April 28, 2005, Clausen was seen at the Ivy Street Medical Clinic for hypertension and headaches; Clausen reported that he had not taken any medications since February; he was diagnosed with hypertension and depression (Tr. 430).

78. At the administrative hearing, held on July 19, 2005, Clausen testified that he was 41 years old (Tr. 451); that his work experience was in the construction industry (Tr. 456); that he last worked as a loader operator (Tr. 457); and that he had recently received a GED (Tr. 451).

79. Clausen testified on July 19, 2005, that he was receiving $401 per week in workers' compensation benefits.

80. Clausen testified that he had three back surgeries (Tr. 453); that none of the surgeries helped his back pain (Tr. 466); that his body ached every day (Tr. 458); and that his left hamstring and foot were also numb (Tr. 458).

9

81. Clausen testified that he could stand for 20 to 30 minutes at a time (Tr. 466); that he could sit 20 to 30 minutes (Tr. 467); that he could lift 10 to 20 pounds and carry a gallon of milk (Tr. 467-468); and that he walked three to four blocks at a time (Tr. 459).

82. When asked about medications, Clausen testified that he took ibuprofen but that he did not believe it helped with the pain (Tr. 459); he stated that he took medications for high blood pressure and depression as well (Tr. 469).

83. Clausen testified that he used a riding lawn mower to mow the lawn for 20 to 25 minutes (Tr. 459-60); that he watched his children who were 12 and 10 and his grandchildren who were 7 and 4 (Tr. 460); that he played catch with his children once or twice a week for 30 minutes (Tr. 473); that he fished occasionally for half an hour at a time (Tr. 474); and that he occasionally cooked meals (Tr. 460).

84. Dr. Doran wrote a letter concerning Clausen's impairments on August 23, 2005, in which he reported that Clausen had a work-related back injury with chronic low back pain despite a radiographically solid lumbar fusion; that Clausen could not perform bending, stooping, prolonged standing, or lifting over 10 pounds; that Clausen required the ability to change positions as needed and could work only four hours a day; and that these were permanent restrictions (Tr. 429).

85. Clausen returned to the Ivy Street Medical Clinic on April 13, 2006, and complained of low back pain that he rated at a 7 on a scale of 0-10; he was diagnosed with hypertension, back pain, and poor compliance; he was prescribed Neurotin 600 mg at night and 300 mg in the morning, Elavil 25 mg, and Relafan 75 mg. BID (Tr. 431).

86. At the supplemental hearing held June 1, 2006, Clausen testified that he had settled the workers' compensation claim (Tr. 494).

87. Clausen testified that he tried to go back to work part time for a couple of months, but had to quit because of pain; he was on light duty working two to four hours per day; he was permitted to alternate sitting and standing, but was unable to find comfort; after work, he would need to lie down and ice his back. (Tr. 499 ).

88. Clausen testified that he is unable to be in one position for any period of time without experiencing pain; that he has pain when he is standing and he has pain if he sits too long; that he experiences constant pain, which radiates from the low back across the hips and into the left leg and foot. ( Tr. 497).

89. Clausen testified that he can stand 15 minutes to 20 minutes, sit 20 to 30 minutes, walk 15 to 20 minutes, but cannot lift because bending causes pain; he indicated that he can squat at the knees, but does not climb or crawl; he stated that the heaviest thing he lifted was a gallon of milk (Tr. 501-502).

90. Clausen testified that he was being treated at the Ivy Clinic and was prescribed Neurontin and Relafen; he was advised to use ice and Aleve for his pain and amitriptyline for sleep. (Tr. 491).

91. Clausen testified Dr. Doran told him that there was nothing more the surgeon could do (Tr. 506).

92. Clausen testified that he did not sleep well (Tr. 507).

93. George Weilepp, M.D., an orthopedic surgeon, testified at the supplemental hearing that Clausen's impairments equaled Listing 1.04 from July 2001 through June 2003 (Tr. 512), but that Clausen was medically improved as of June 2003 (Tr. 517).

94. Dr. Weilepp opined that Clausen could frequently lift 10 pounds and occasionally lift 20 pounds (Tr. 520); that Clausen could sit 6 hours with a sit/stand option at 90 minutes (Tr. 520); that Clausen could stand or walk 6 hours a day for 90 minutes at a time (Tr. 520-521); that Clausen would be precluded from working at heights or on ladders (Tr. 521); that Clausen should avoid heavy industrial vibration and dangerous industrial equipment with the lower extremities (Tr. 521); that Clausen could not perform industrial driving and could climb one flight of stairs two to three times a day (Tr. 521); and that Clausen could not perform frequent kneeling, crawling, squatting, or overhead activities (Tr. 521).

95. A vocational expert, Anita Howell, was asked a hypothetical question that assumed a person of Clausen's age, education and work experience, who had limitations consistent with the opinion provided by Dr. Weilepp; the vocational

11

expert testified that such an individual could work as a cashier, inspector packager, food and beverage order clerk, and information clerk (Tr. 526-27).

### *The Issues on Appeal*

Clausen claims that the ALJ's finding of no disability after June 14, 2003, is erroneous because:
1. There is not sufficient evidence in the record to support a finding of medical improvement under 20 C.F.R. § 404.1594(b)(1).
2. The ALJ failed to give controlling weight to Dr. Doran's opinions in accordance with Social Security Ruling (SSR) 96-2p.
3. The ALJ failed to give substantial weight to Dr. Doran's opinions in accordance with 20 C.F.R. § 404.1527(d).
4. The ALJ failed to assess Clausen's credibility in accordance with *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).

### *DISCUSSION*

A denial of benefits by the Commissioner is reviewed to determine whether the denial is supported by substantial evidence on the record as a whole. *Hogan v. Apfel*, 239 F.3d 958, 960 (8th Cir. 2001). "Substantial evidence" is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusion. *Id.*, at 960-61; *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000). Evidence that both supports and detracts from the Commissioner's decision must be considered, but the decision may not be reversed merely because substantial evidence supports a contrary outcome. *See Moad v. Massanari*, 260 F.3d 887, 890 (8th Cir. 2001).

This court must also review the decision of the Commissioner to decide whether the proper legal standard was applied in reaching the result. *Smith v. Sullivan*, 982 F.2d 308, 311 (8th Cir. 1992). Issues of law are reviewed de novo.

*Olson v. Apfel*, 170 F.3d 820, 822 (8th Cir. 1999); *Boock v. Shalala*, 48 F.3d 348, 351 n.2 (8th Cir. 1995); *Smith*, 982 F.2d at 311.

The Social Security Administration uses a five-step process to determine whether a claimant is disabled.  *See* 20 C.F.R. § 404.1520.

> At the first step, the claimant must establish that she has not engaged in substantial gainful activity.  The second step requires that the claimant prove she has a severe impairment that significantly limits her physical or mental ability to perform basic work activities.  If, at the third step, the claimant shows that her impairment meets or equals a presumptively disabling impairment listed in the regulations, the analysis stops and the claimant is automatically found disabled and is entitled to benefits.  If the claimant cannot carry this burden, however, step four requires that the claimant prove she lacks the residual functional capacity to perform her past relevant work.  Finally, if the claimant establishes that she cannot perform her past relevant work, the burden shifts to the Commissioner at the fifth step to prove that there are other jobs in the national economy that the claimant can perform.

*Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006).  "The RFC is used at both step four and five of the evaluation process, but it is determined at step four, where the burden of proof rests with the claimant."  *Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005).  "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations."  *Id.* (internal quotations and citations omitted).

### *Medical Improvement*

Clausen's argument that a medical improvement standard must be applied to determine whether he was disabled after June 14, 2003, is misplaced.  The Eighth Circuit has held that in cases such as this, where the ALJ has determined in one proceeding the fact, extent, and duration of a claimant's disability, the determinative

question, as usual, is whether there is substantial evidence on the record as a whole to support the ALJ's decision that the claimant is capable of performing gainful work. *See Ness v. Sullivan*, 904 F.2d 432, 434 & n. 4 (8th Cir.1990); *Camp v. Heckler*, 780 F.2d 721, 721-22 (8th Cir.1986) (per curiam). *See also Eckelstafer v. Barnhart*, 2002 WL 31545905, *1, 51 Fed.Appx. 185, 186, (8th Cir. 2002); *Dorsey v. Apfel*, 1998 WL 3616, *1, 133 F.3d 921 (8th Cir. 1998) (Table).

### *Treating Physician's Opinions*

When determining whether a claimant is disabled, "[t]he ALJ [has] a duty to evaluate the medical evidence as a whole." *Casey v. Astrue*, 503 F.3d 687, 691 (8th Cir. 2007). "A treating physician's opinion is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." *House v. Astrue*, 500 F.3d 741, 744 (8th Cir.2007) (internal quotation omitted). "However, while entitled to special weight, it does not automatically control, particularly if the treating physician evidence is itself inconsistent." *Id.* (internal quotation omitted). Additionally, "[a]n ALJ may credit other medical evaluations over that of the treating physician when such other assessments are supported by better or more thorough medical evidence." *Casey*, 503 F.3d at 691-92. "In considering how much weight to give a treating physician's opinion, an ALJ must also consider the length of the treatment relationship and the frequency of examinations." *Id.* at 692 (citing 20 C.F.R. § 404.1527(d)(2)(i)).

In this case, the ALJ offered the following explanation for why she was giving more weight to the testimony of the medical expert, Dr. Weilepp, than to the report letter submitted by Clausen's treating physician, Dr. Doran:

> A progress note from Dr. Doran, dated August 13, 2003, shows that CT scan revealed adequate fusion and the claimant had recently undergone a functional capacity evaluation. He noted that he agreed with the restrictions found during the functional capacity evaluation (performed

14

on June 26, 2003), and stated that the claimant had been unable to tolerate a conditioning program. Dr. Doran stated that the claimant's employer may not be able to accommodate his restrictions permanently; and, if not, then he should be a candidate for job retraining. (Exhibit 13F/4) When evaluated by Dr. Doran on August 26, 2003, the claimant advised that he could not function on the current amount of narcotics that were being prescribed. Dr. Doran informed him that he was reluctant to prescribe more narcotics indefinitely for him and recommended an evaluation at a pain management center (Exhibit 13F/3)

The Functional Capacity Evaluation performed by Jay Spracklen, PT, on June 26, 2003, showed that the claimant has the ability to perform work at the light physical demand level. . . .

When the claimant completed the pain management program in September 2004, he was doing well, walking 30 minutes, climbing four flights of stairs, and was planning to go back to work. The evaluator stated that he believed "Chris is able to return to a moderate physical job within limits of his surgeon's recommendations." He further stated that "Chris has been up and active at least eight hours per day using a variety of activities and postures each day he has participated in the pain management program." (Exhibit 19F/3)

The medical expert present at the hearing testified that it is his opinion that the claimant is capable of light work if his pain is managed. He noted that it is his impression that, from June 2003, Mr. Clausen could have returned to light work, with the ability to change positions every 90 minutes. Dr. Weilepp noted that, based on his experience, because the claimant has had a solid fusion, there is no reason to place further restrictions on him. . . .

When formulating this opinion, Dr. Weilepp acknowledged that the claimant's treating physician, in a letter dated August 23 2005, had limited the claimant to a maximum workday of four hours. However, he opined, it appeared that Dr. Doran had placed these same restrictions on the claimant in February 2003, even though Mr. Clausen had been followed in a pain management program through August 2004 and that

15

since that time, has undergone psychological assessments, with no evidence to indicate any reason that he could not have improved. Dr. Weilepp reported that, generally, individuals improve with the amount of attention and management which the claimant has received, and that his opinion was not based entirely on the functional capacity evaluation. He acknowledged that pain may be the issue. He voiced disagreement with the treating source's opinion that Mr. Clausen should still be restricted to a maximum four-hour workday, citing the fact that the claimant has had extensive treatment in a pain management program, and assessments made by a psychologist do not comport with such a restrictive finding.

. . .

In terms of the opinion evidence, the undersigned is most persuaded by the opinion of the medical expert present at the hearing and gives it greatest weight. Dr. Weilepp provided a convincing argument that he does not feel that the claimant is as limited as his treating source indicated. Although the claimant testified that he was examined by Dr. Doran before he provided his most recent opinion on August 23, 2005 that the claimant is restricted to a maximum workday of four hours, the medical expert noted that there is no report in the evidence of record which supports this opinion. He noted that Dr. Doran alluded to his previous restrictions which were given on February 26, 2003, which are the same as those he identified on August 23, 2005. Dr. Weilepp further opined that the record is not clear why Dr. Doran continued to restrict the claimant to a maximum four-hour workday, especially when one considers the fact that feedback from the psychologist and rehabilitation therapists for several months did not appear to show that the claimant was not progressing. While the undersigned has considered the treating source opinion most recently submitted on August 23, 2005, it is simply not supported by recent diagnostic findings.

(Tr. 28-30.)

Dr. Doran released Clausen for sedentary work on November 27, 2002, with no restriction upon the number of hours per day that he could work (Tr. 310). The

four-hour restriction was first imposed on February 26, 2003, after a CT scan showed that the spinal fusion was not fully consolidated (Tr. 307), and, on August 16, 2003, was continued for six weeks until a CT scan would be performed to reassess the fusion (Tr. 306). The CT scan on June 11, 2003, showed that Clausen was "fused well" (Tr. 305). Significantly, Dr. Doran did <u>not</u> indicate after this CT scan that the four-hour per day restriction was to continue; in fact, he noted that "Clausen states that [his employer] do[es] not have additional hours for him to work" at light duty (Tr. 305). Dr. Doran also noted: "A functional capacity evaluation (FCE) has been ordered for his final restrictions." (Tr. 305) The FCE showed that Clausen was capable of performing light work, and Dr. Doran stated on August 13, 2003, that "[t]he restrictions listed in this [FCE], I think, are reasonable." (Tr. 303) The restrictions listed in the FCE did not include any limitation on the number of hours per day that Clause could work. Nor did Dr. Doran specifically continue the four-hour restriction on August 13, 2003; he did note, however, that Clausen "should be a candidate for job retraining" if his current employer could not accommodate his restrictions. (Tr. 303)

Dr. Doran did not see Clausen again until two years later, when Clausen evidently returned to his office in order to obtain an updated report, as had been requested by the ALJ at the conclusion of the first hearing. Although Dr. Doran's report letter of August 23, 2005, does not mention any examination of Clausen, but merely indicates that it was prepared in response to correspondence from Clausen's attorney (Tr. 429), Clausen testified that he was examined by Dr. Doran for "[m]aybe a half hour." (Tr. 506) When asked about the examination, Clausen stated, "[Dr. Doran] asked . . . how I was feeling, and I told him not very good, and, you know he said there was really not much more he could do for me." (Tr. 506)

Dr. Doran's report letter of August 23, 2005, wherein he states that Clausen has been restricted to working "a maximum of four hours per day" since February 26, 2003 (Tr. 429), is inconsistent with his own office records, which, as discussed above, reflect that the four-hour restriction was only in effect for about six months,

17

until August 13, 2003.  As stated in a workers' compensation report dated January 17, 2005, which was put into the record by Clausen's attorney:  "Although restrictions have been placed upon Mr. Clausen's activities, no limitations have been placed upon his work hours."  (Tr. 220)

Because of this inconsistency, and also considering that Dr. Doran had not treated Clausen for two years, I conclude that the ALJ did not err by discounting his report letter of August 23, 2005.

### *Claimant's Credibility*

To assess a claimant's credibility, the ALJ must consider all of the evidence, including prior work records and observations by third parties and doctors regarding daily activities, the duration, frequency, and intensity of pain, precipitating and aggravating factors, the dosage, effectiveness, and side effects of medication, and functional restrictions.  *Lowe v. Apfel*, 226 F.3d 969, 971-72 (8th Cir. 2000) (citing *Polaski*).  The ALJ may not discount a claimant's complaints solely because they are not fully supported by the objective medical evidence, but the complaints may be discounted based on inconsistencies in the record as a whole.  *Id.* at 972.  Where adequately explained and supported, credibility findings are for the ALJ to make.  *Id.* (citing *Tang v. Apfel*, 205 F.3d 1084, 1087 (8th Cir.2000)).

The ALJ is not required to discuss methodically each *Polaski* consideration, so long as she acknowledges and examines those considerations before discounting the subjective complaints.  *Id.* (citing *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir.1996)).  The ALJ's decision in this case cites *Polaski*, and also quotes Social Security Ruling 96-7p and 20 C.F.R. §§ 404.1529.  (Tr. 26-28)  Based upon my review of the ALJ's decision in its entirety, and considering the nature of Clausen's complaints, I am satisfied that a proper credibility determination was made in this case.  For example, as part of this determination, the ALJ stated:

When applying these [*Polaski*] factors to the instant case, the undersigned notes that the claimant's daily activities are inconsistent with his allegations of disabling pain. Mr. Clausen testified that he assists with the care of his four children, does some cooking, drives his car, goes to the store, and rides a mower to mow the grass for 20 to 25 minutes. Review of a progress note from James Willcockson, PhD, during the claimant's involvement in the pain management program, indicates that the claimant has been in training to do computer work, but is not really interested in that. The claimant stated that he "has done some roofing on the side and feels that he could possibly do some aspects of roofing still." (Exhibit 19F/68) On August 10, 2004, the claimant acknowledged that his goals are to return to his old job on a full-time basis, and be able to "go deer and/or pheasant hunting, including walking on uneven surfaces for long periods of time; and he would like to be able to pace up to fishing for longer periods of time than one or two hours as he is doing now." (Exhibit 19F/66) A progress note from Dr. Willcockson, dated August 13, 2004, states that: "Chris says that he wants very much to return to work and that he feels like he could find a job doing the work he had been doing." (Exhibit 19F/50) On August 16, 2004, Dr. Willcockson noted that the claimant reported that he had a great day at the lake this weekend, first fishing alone, then enjoyed his family there as well." He stated that, "despite his increased activity over the weekend, no one noticed anything different about him." (Exhibit 19F/46)

Although the claimant testified that he is in constant pain, the record shows that he is not currently prescribed any pain medications. He testified that he had previously attended a pain management clinic to aid him in weaning off of narcotic pain medications; and stated that he last took narcotic pain medications in August 2003. While it is commendable that the claimant has taken steps to avoid narcotic addiction, this raises some doubt regarding the severity of his pain to the extent that he is totally unable to function. He did testify that he uses ice in an attempt to manage his pain.

Thus, the undersigned must conclude, based upon a consideration of subjective allegations weighed against objective medical evidence and other relevant information bearing on the issue of credibility, that the

19

claimant has exaggerated his physical complications; and so, such subjective allegations are found to lack credibility.

(Tr. 29-30.)

## *CONCLUSION*

For the reasons stated, I find that the Commissioner's decision is supported by substantial evidence on the record as a whole and is not contrary to law.

Accordingly,

IT IS ORDERED that the decision of the Commissioner is affirmed. Judgment will be entered by separate document.

February 20, 2008.                    BY THE COURT:

                                      s/ *Richard G. Kopf*
                                      United States District Judge